# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### PARKERSBURG DIVISION

| | |
|---|---|
| **CRYSTAL RENAYE LEDSOME,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **CIVIL ACTION NO. 6:13-32483** |
| | ) |
| **CAROLYN W. COLVIN ,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

### **PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order entered January 6, 2014 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 10 and 11.) and Plaintiff's Reply. (Document No. 12.) .

The Plaintiff, Crystal Renaye Ledsome, (hereinafter referred to as "Claimant"), filed an application for SSI on October 29, 2010 (protective filing date), alleging disability as of January 1, 2005, due to depression, bipolar disorder, anxiety, posttraumatic stress disorder ("PTSD"), and carpal tunnel syndrome ("CTS").[1] (Tr. at 14, 137, 139-50, 209, 213.) The claim was denied initially and upon reconsideration. (Tr. at 60-61, 68-70, 74-76.) On June 15, 2011, Claimant requested a hearing

---

[1] Claimant protectively filed a prior application for SSI on August 10, 2009, which application was denied initially and upon reconsideration. (Tr. at 14, 55-59, 63-65, 134-36, 172-75, 176-83.)

before an Administrative Law Judge (ALJ). (Tr. at 83-85.) A hearing was held on July 2, 2012, before the Honorable Jack Penca. (Tr. at 27-50.) By decision dated July 23, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-25.) The ALJ's decision became the final decision of the Commissioner on October 25, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on December 18, 2013, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the

>degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>	(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since October 29, 2010, the application date. (Tr. at 16, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "bipolar disorder and posttraumatic stress disorder," which were severe impairments. (Tr. at 16, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform work at all exertional levels, as follows:

> [T]he [C]laimant has the residual functional capacity to perform a full range of work at all exertional levels. However, the [C]laimant is limited to simple, routine repetitive tasks with no production rate or pace work. The [C]laimant is limited to only occasional decision making and occasional changes in the work setting. She may have only occasional interaction with coworkers and the public.

(Tr. at 18, Finding No. 4.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 24, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a laundry worker

and warehouse worker, at the medium exertional level, and jobs such as a maid, at the light level of exertion. (Tr. at 24-25, Finding No. 9.) On this basis, benefits were denied. (Tr. at 25, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on December 3, 1978, and was 33 years old at the time of the administrative hearing, July 2, 2012. (Tr. at 24, 33.) Claimant had at least a high school education, having obtained her Generalized Equivalency Diploma, and was able to communicate in English. (Tr. at 24, 40, 212, 214.) Claimant had no past relevant work. (Tr. at 24, 46, 214.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to the undersigned's findings and recommendation.

Dr. Rakesh Wahi, M.D.:

Dr. Wahi, conducted a consultative examination on October 21, 2009. (Tr. at 298-305.) Claimant reported that she experienced frequent numbness in her hands when she engaged in repetitive motion or activities, which resolved upon cessation. (Tr. at 298.) Claimant was able to perform her activities of daily living, including opening doors and jars and picking up change. (Id.) Dr. Wahi noted that the numbness failed to cause any significant restriction in her daily activities that required fine manipulation with either hand. (Id.) She avoided wearing clothing that required buttoning. (Id.) Claimant further reported aches and pains in her knees and shoulders, without any significant restriction. (Id.)

On physical examination, Dr. Wahi observed that Claimant had normal range of motion of the cervical and lumbar spine, had normal gait and station, was able to get on and off the exam table without difficulty, was able to walk on her heels and toes, was able to squat, had no atrophy, and had normal sensation and reflexes. (Tr. at 301.) She had normal range of motion of her shoulders, elbows, wrists, hips, knees, and ankles bilaterally; fully extended both hands; made fists bilaterally; and apposed her fingers. (Id.) Upper extremity and grip strength was 5/5 bilaterally, though there was a historical loss of strength on repetitive motion in both hands. (Id.) Dr. Wahi opined that Claimant was capable of carrying out all her activities of daily living. (Id.)

Fulvio Franyutti, M.D. - Physical RFC Assessment:

On November 4, 2009, Dr. Franyutti, a state agency consultant, completed a form Physical RFC Assessment, on which he opined that Claimant's athralgias resulted in no functional limitations. (Tr. at 321-30.) He noted that Claimant prepared her own meals, cleaned, did laundry, mowed grass,

shopped for groceries, went outside daily, walked one quarter mile before resting, and did not require an assistive device, though she reported difficulty kneeling. (Tr. at 326.) He further noted that she was able to maintain her personal care. (Id.) In reaching this opinion, Dr. Franyutti reviewed x-rays of Claimant's hands and Dr. Wahi's consultative examination report. (Tr. at 328.) Dr. Uma Reddy, M.D., another state agency consultant, affirmed Dr. Franyutti's assessment of a non-severe impairment on January 25, 2010. (Tr. at 333-35.)

James E. Levos, M.D.:

On April 19, 2010, Claimant reported pain in her right hand for some time, that was aggravated by flexing and relieved by dorsiflexing it. (Tr. at 347, 363, 552.) She indicated that she had been diagnosed with CTS and requested some help with her condition. (Id.) Physical exam revealed a positive Phalen's sign in the right wrist and she was referred to a neurosurgeon for a consult and advised to wear a wrist splint. (Id.)

Parkersburg Neurological Associates:

An EMG and NCV study on June 10, 2010, revealed very mild right CTS. (Tr. at 336, 578.)

On July 9, 2010, Melissa Conner, PA-C, examined Claimant in the neurosurgery outpatient clinic for complaints of neck pain and paraesthesias on the referral of Dr. Levos. (Tr. at 365-69, 569-73.) Claimant reported pain and paraesthesias that started in the bilateral hands, right greater than the left, that radiated to the elbows intermittently. (Tr. at 365, 569.) She described the pain as aching in nature and rated the pain at a level 5 to 8 out of ten. (Id.) Claimant stated that the pain began three years prior, with no known injury, and that the symptoms were intermittent and aggravated with activity, holding her arms upward, driving, and typing. (Id.) The pain was alleviated with pulling fingertips back. (Id.) She also reported hand weakness bilaterally and that medication in the past was unable to provide adequate relief. (Id.) Claimant further reported pain in the cervical spine that radiated to her shoulders, right greater than left, and to the intrascapular region. (Id.) She described

the pain as a dull ache in nature and rated the pain at a level 0 to 5 out of ten. (Id.) She indicated that the pain began ten years ago and that her symptoms were intermittent. (Id.)The right shoulder pain occasionally woke her up at night. (Id.)

On physical examination, Ms. Conner observed full range of cervical spine motion, positive Phalen's sign on the right and left, mild tenderness to palpation of the right upper extremity, normal range of right upper extremity motion, 4+/5 right grip strength, 5/5 left grip strength, intact sensation, and normal gait and station. (Tr. at 367-68, 571-72.) Ms. Conner assessed neck pain, cervical radiculopathy, and very mild right CTS by EMG. (Tr. at 368, 572.) She recommended bilateral wrist splints and ordered an MRI of the cervical spine. (Tr. at 369, 573.)

An MRI of Claimant's cervical spine on August 4, 2010, revealed cervical radiculopathy, cervical arthralgia, and kyphosis. (Tr. at 370.) There were no disc herniations, significant stenosis, or evidence of neural impingement. (Id.) There was loss of the cervical lordosis with a smooth cervical kyphosis. (Id.)

On August 9, 2010, Ms. Conner noted that the MRI revealed reversal of the normal lordotic curvature with mild cervical kyphosis centered at C4. (Tr. at 372, 574.) On exam, Ms. Conner observed full range of motion of the cervical spine, positive Tinel's and Phalen's signs of the bilateral wrists, mild tenderness to palpation of the right upper extremity, and 4+/5 right upper extremity grip strength. (Tr. at 374-75, 574-75.) The exam essentially yielded normal results in all other respects. (Id.) Ms. Conner again assessed neck pain and very mild right CTS by EMG. (Tr. at 375, 575.) Regarding Claimant's cervical spine, Ms. Conner concluded that the MRI failed to reveal any significant neural impingement, and therefore, surgery was not required. (Id.) She suggested that Claimant try conservative treatments such as physical therapy, if she wanted. (Id.) Regarding the CTS, Ms. Conner suggested surgical release, as Claimant had seen only mild improvement on the right with wearing wrist splints. (Id.) Claimant opted for the surgical procedure. (Id.)

9

On September 9, 2010, Claimant underwent right CTS release surgery by Dr. H. Khosrovi, M.D. (Tr. at 344-47, 531-32.) On September 29, 2010, Claimant reported severe pain in her right hand incision. (Tr. at 376.) Sutures were removed and she was advised to avoid lifting greater than ten pounds. (Id.) On October 4, 2010, Claimant reported tingling and burning at the incision sight, but she had no tenderness to palpation and it was noted that the incision was healing well. (Tr. at 377.) On October 8, 12, and 21, 2010, it was noted that Claimant was doing well, and it was recommended on October 21, that she increase the use of her hand with physical therapy. (Tr. at 378-80.)

On December 13, 2010, Dr. Khosrovi noted Claimant's reports that she had improved about 50 to 75% since surgery. (Tr. at 579.) Claimant denied any new or worsening neurological symptoms and difficulty with gait or coordination. (Id.) She had progressed well with physical therapy and although she had weakness in the right grip, Claimant believed that her strength and grip in the right hand had improved. (Id.) She further believed that her pre-operative pain and paraesthesias had improved and reported only intermittent paraesthesias in the palmar aspect of the right hand. (Id.) She indicated that when typing, her left arm tired easily. (Id.)

Physical examination revealed full range of cervical motion, full upper extremity strength and motor function, intact sensation, and normal gait and station. (Tr. at 581.) Dr. Khosrovi advised Claimant to continue her post-op course of physical therapy for the right hand and offered an EMG of the left upper extremity to determine if release was necessary. (Tr. at 582.) Claimant stated that she did not want to have surgery on the left wrist at that time. (Id.) She was instructed to return to the office as needed. (Id.)

K. Sarpolis, M.D. - Physical RFC Assessment:

On December 20, 2010, Dr. Sarpolis, a state agency consultant, completed a form Physical RFC Assessment, on which he opined that Claimant's Right CTS status post release resulted in her

ability to perform light exertional level work with no pushing and pulling with the right upper extremity; occasional climbing ladders, ropes, and scaffolds; never crawling; limited handling and fingering; and an avoidance of vibration. (Tr. at 420-27.) Dr. Sarpolis noted that the evidence was insufficient and that the assessment was from the prior denial of January 26, 2010, through the present. (Tr. at 427.) She opined that Claimant could be expected to improve but that the evidence was insufficient to determine function. (Id.)

On January 31, 2011, Dr. Sarpolis noted that Claimant submitted additional information in the form of activities of daily living and allegations of difficulties resulting from her CTS and mental impairments. (Tr. at 428.) Dr. Sarpolis noted that the narratives were well written by Claimant, in her own handwriting. (Id.) Dr. Sarpolis opined that Claimant's "prior periods of insufficient evidence are reaffirmed as written. Her post-denial period of 1/26/10 - 1/26/11 saw the resolution of this impairment and is now non-severe. It did not last one year." (Id.)

Uma Reddy, M.D. - Physical RFC Assessment:

On May 2, 2011, Dr. Reddy, a state agency consultant, completed a form RFC Assessment, on which she opined that Claimant's CTS was a non-severe impairment. (Tr. at 498-505.) She noted that the evidence failed to indicate any limitations from her impairment after her surgery. (Tr. at 504.) On May 13, 2011, Dr. Marcel Lambrechts, M.D., reviewed Dr. Reddy's assessment and affirmed it as written. (Tr. at 506.) Although he received a poorly written report from Claimant, he found no reason to change the assessment. (Id.) He further found that Claimant's complaints of neck and right shoulder pain were not supported by the evidence. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that her carpal tunnel syndrome and cervical spine condition were severe impairments. (Document No. 10 at 4-8.) Pursuant to Social Security Ruling 96-3p,

Claimant asserts that these physical impairments were more than a slight abnormality. (Id. at 5.) Citing to the evidence of record, Claimant indicates that on October 21, 2009, she reported to Dr. Wahi that she experienced frequent numbness of the bilateral hands when she engaged in repetitive motion or activities and that the pain subsided when she stopped the activities. (Id.) She also stated that she avoided wearing clothing with buttons and that she had aches and pains in her knees and shoulders. (Id.) On April 19, 2010, her right hand pain was aggravated by palmar flexing and relieved by dorsiflexing and she was given a wrist splint. (Id.) On June 10, 2010, EMG and NCV studies revealed very mild right CTS. (Id.) On July 9, 2010, Claimant indicated that the pain radiated to the elbow, that the pain had persisted for three years, and that the cervical spine pain radiated to her shoulders and intrascapular area. (Id. at 6.) She notes positive Phalen's signs, diminished grip strength, and that she underwent CTS release on the right. (Id. at 6-7.) Following surgery, Claimant continued to have right grip weakness and intermittent paraesthesias and fatigue in the left arm when typing. (Id. at 7.) Claimant, therefore, asserts that she had continued symptomatology with both impairments, limitations from the impairments, and that both conditions continued for at least a twelve-month period. (Id.) Consequently, Claimant contends that the impairments are severe. (Id.) She further asserts that even if the impairments are non-severe, pursuant to SSR 96-8p, the ALJ failed to consider the impact of the impairments in assessing her RFC, and therefore, remand is required. (Id.)

In response, the Commissioner asserts that the evidence supports the ALJ's finding that Claimant's physical impairments did not cause significant functional limitations, and therefore, were non-severe. (Document No. 11 at 6-7.) The Commissioner notes that the ALJ aptly relied on Dr. Wahi's notes that detailed Claimant's functional abilities, the benign EMG and nerve conduction study and cervical MRI, and he noted that Claimant's upper right extremity improved in three months after the right CTS release surgery. (Id. at 7.) The Commissioner further asserts that the record as a

whole supports the ALJ's decision. (Id.) She notes that Claimant testified that as of the July 2012, administrative hearing, she worked as a telemarketer, which job requires frequent fingering and occasional reaching and handling. (Id.) Additionally, she had indicated that she was a full-time student at an online university, which requires frequent sitting and bilateral hand use to operate a computer. (Id.) Moreover, her reported activities contradict her allegations of functional limitations resulting from her physical impairments. (Id.) Accordingly, the Commissioner contends that Claimant's allegations are without merit. (Id. at 7-8.)

Analysis.

Claimant alleges that the ALJ erred in failing to determine that her CTS and cervical spine condition were severe impairments. (Document No. 10 at 4-8.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2012). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); see also SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work

even if the individual's age, education, or work experience were specifically considered."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

In his decision, the ALJ determined that Claimant's bipolar disorder and posttraumatic stress disorder were severe impairments. (Tr. at 16.) The ALJ found that the evidence was consistent with finding that Claimant had no severe physical impairment. (Tr. at 17.) The ALJ summarized Dr. Wahi's treatment notes, which included Claimant's symptoms of pain and numbness that were resolved when she ceased her activities. (Id.) Although the ALJ did not indicate that she avoided wearing clothing due to difficulty buttoning, he noted that she essentially was able to perform her daily activities without restriction, including fine manipulation activities such as opening doors and jars and picking up change. (Id.) The EMG and NCS revealed only very mild right CTS. (Id.) The ALJ also summarized Ms. Conner's and Dr. Khosrovi's treatment notes and acknowledged that Claimant underwent right CTS release surgery in September 2010, and that only three months later, she had achieved good results. (Id.) As Claimant notes she had some intermittent paraesthesias in the palmar aspect of her right hand following surgery and some weakness in her grip. (Tr. at 579.) Nevertheless, objective physical findings revealed full strength and motor function of her right upper extremity. (Tr. at 581.) Claimant alleges that her left arm tires easily when typing but she declined the recommended CTS release surgery. (Tr. at 581.)

Respecting Claimant's cervical spine condition, the ALJ noted that the MRI revealed no evidence of disc herniation, significant stenosis, or neural impingement. (Tr. at 17.) He concluded that essentially the MRI yielded normal results. (Id.) The ALJ's findings are predicated upon Ms.

Conner's and Dr. Khosrovi's reports of reversal of the normal lordotic curvature with mild cervical kyphosis centered at C4, and recommendation that she undergo conservative treatment, if she desired. Physical exams failed to reveal any findings suggestive of functional limitations resulting from Claimant's cervical condition, and she consistently had full range of motion of her cervical spine and upper extremities.

Additionally, the opinion evidence of record from Drs. Franyutti, Reddy, and Lambrechts fail to support a finding of any severe physical impairment. (Tr. at 23.) Moreover, as the ALJ noted in his decision, Claimant was working 25 hours a week as a telemarketer at the time of the administrative hearing. (Tr. at 19.) As the Commissioner points out, such work, according to the Dictionary of Occupational Titles ("DOT"), requires frequent fingering skills and occasional reaching and handling. See DOT Occupational No. 299.357-014 ("Telephone Solicitor"). Additionally, she was a full-time student at an online university, which required her to use a computer. Claimant further reported in her Function Report - Adult, dated January 25, 2011, that she cared for her pets, managed her personal care, cooked daily, cleaned, drove, shopped, paid bills, managed money, and went to medical appointments and the library. (Tr. at 222-26.)

In view of the foregoing, the undersigned finds that the ALJ's step two and RFC analyses[3]

---

[3] "RFC represents the most that an individual can do despite his or her limitations or restrictions." *See* Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2012). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." *Id.* "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her

are supported by the substantial evidence of record. Although Claimant has cervical spine and CTS impairments, the record demonstrates that the conditions fail to result in significant limitations on her ability to perform basic work activities. The objective findings reveal that the conditions are minimal and Claimant's continued activities, despite some symptomatology demonstrate that the impairments are only slight abnormalities that have a minimal effect on Claimant. For these reasons, the undersigned recommends that the District Court find that the ALJ's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 11.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review

---

impairments." *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 2, 2015.

*R. Clarke VanDervort* (signature)

R. Clarke VanDervort
United States Magistrate Judge